FILED
2005 Jul-27 PM 04:13
U.S. DISTRICT COURT
N.D. OF ALABAMA

IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ALABAMA
SOUTHERN DIVISION

| | |
|---|---|
| IRIS J. MILLS,                    }<br>                                   }<br>     Plaintiff,                    }<br>                                   }<br>v.                                 }<br>                                   }<br>BIRMINGHAM BOARD OF                }<br>EDUCATION,                         }<br>                                   }<br>     Defendant.                    } | CIVIL ACTION NO.<br>03-AR-3087-S |

**MEMORANDUM OPINION**

Before the court is the motion for summary judgment filed by defendant, Birmingham Board of Education ("Board"). The Board seeks summary judgment of all claims by plaintiff, Iris Mills ("Mills"). Mills brings claims under the Americans with Disabilities Act ("ADA"), Alabama State Disability Statute, Family Medical Leave Act("FMLA"), Title VII, and 42 U.S.C. § 1981. She adds a claim for breach of contract.

**Facts**[1]

Mills, a white female, was hired in 1993 to teach speech, drama and debate at Jackson-Olin High School. On May 9, 2000, the

---

[1] Summary judgment is appropriate where the moving party demonstrates that there is no genuine issue of material fact and that it is entitled to judgment as a matter of law. Rule 56(c), F.R.Civ.P.; *see Celotex Corp. v. Catrett,* 477 U.S. 317, 322 (1986). In assessing whether the movant has met its burden, the court must view the evidence, and all inferences drawn therefrom, in the light most favorable to the non-movant. *Hairston v. Gainesville Sun Pub. Co.*, 9 F.3d 913, 918 (11th Cir. 1993). In accordance with this standard, the following statement of facts includes both undisputed facts and the facts according to the plaintiff's evidence, where there is a dispute.

1

former Superintendent of Birmingham City Schools, Dr. Johnny Brown, sent a letter to Mills informing her of the proposed cancellation of her employment contract, expressing concern over what it called "excessive tardies" and "excessive absences." On June 26, 2001, over a year later, Mills sued the Birmingham Board of Education alleging violations of the ADA, Title VII, and 42 U.S.C. §§ 1981 and 1983.[2] In order to end that litigation Mills and the Board entered into a settlement agreement under which the parties agreed that: (a) "all references to Mills' proposed termination action will be removed from her personnel file and will be placed only in her legal file;" (b)Mills will work at West End High School as an English teacher; (c) "Mills acknowledges her understanding that should [excessive tardies and absences] continue with her employment in her new position at West End High School, or at any subsequent position she may hold in the future with the Board, she will be subject to discipline, up to and including termination;" and (d) Mills' lawsuit against Board will be voluntarily dismissed. The Board voted to accept the terms of the settlement. On August 7, 2001, the Superintendent, Dr. Brown, gave written notice of the execution of the settlement agreement by letter, copying Mills' personnel file, *inter alia*, on the letter.

On August 8, 2001 Mills reported to West End High School for

---

[2]*Iris J. Mills v. Birmingham Board of Education*, CV-01-PWG-1604-S,(N.D. Ala.).

the beginning of the school year. The principal of West End High School, Elbert Morrow, was aware of the confidential settlement when Mills began at West End.[3] On the first day of school, Mills claims that she spoke with Morrow about some relevant situations in her personal life, in particular, her and her husband's medical conditions. She says that she requested accommodation from Morrow at that meeting, and that he responded by instructing the staff at West End to set her schedule up in such a way as to allow that her first period class was a planning period without any students under her supervision. Mills claims that this understanding was reached so she could arrive at school late. Morrow says that no such bargain was struck, and that he, in fact, told her that there was no exception to the rule that she must arrive by 8:15 a.m.. The Board says that if Morrow made such a deal, he did not have the authority to make it. Mills never requested any accommodation directly from the Board. Mills now claims that "after the Board informed Ms. Mills' principal at West End High School of the settlement agreement, Principal Morrow began to take issue with Ms. Mills' attendance despite their agreed arrangement for accommodations."

Mills' began to arrive late almost immediately upon beginning work at West End. In a letter dated September 25, 2001, Morrow

---

[3]All of the evidence indicates that he was copied on the letter by Dr. Johnny Brown, dated August 7, 2001, which specifically references the settlement agreement.

reprimanded Mills for being tardy on several occasions. According to school records, by November 6, 2001, Mills had been tardy 26 times, and wholly absent from school on 23 other occasions. Mills sometimes asked secretaries to cover classes for her, or to find another teacher to do so. Mills was also reprimanded because she turned in grades, due on October 30, 2001, approximately one month late.  When confronted with the problems with her tardiness and absences, Mills cited illness as the reason. Morrow was aware that this was the reason why the grades were late. In November, 2001, Morrow recommended to Vivian Davis, the Executive Director of Human Resources, that Mills be terminated. Nevertheless, Mills was not terminated at that time.

During the entire 2001-2002 school year, Mills was absent 78 days. During the same period, she was tardy 85 days.[4] The Board's sick leave policy requires that any teacher who is absent on five (5) consecutive days is required to submit documentation from a medical provider certifying the illness. Mills provided only 58 excuses for her 78 absences. Mills did call every time she was going to late or absent, and she often worked after school hours were over to catch up on her work.

On March 5, 2002, Morrow requested that Mills submit her plan book to him as soon as possible. Mills did not submit her plan book. Morrow informed Mills that he saw the failure to submit a

---

[4]The court understands tardiness to be based on an arrival time of 8:15 a.m..

plan book as insubordination. On March 25, 2002, Morrow recommended, for a second time, that Mills be terminated. In the same letter, Morrow requested a permanent substitute teacher to cover Mills' teaching position for the remainder of the year. On April 3, 2002, Morrow recommended the termination of Mills for a third time. On that same day, Morrow was informed that a performance evaluation of Mills' could not be undertaken because Mills had not reported to work since March 8.

On May 13, 2002, interim Superintendent of Education, Dr. Wayman Shiver, Jr., informed Mills of the Board's proposed cancellation of her employment contract. In compliance with Alabama Teacher Tenure law, the reasons for the proposed cancellation were listed for Mills as follows: (1) "You have been excessively tardy;"(2) "you have been excessively absent from work;" (3) "You have failed to complete assigned tasks;" and (4) "You have been dilatory in submitting required paperwork." Mills protested the proposed cancellation. Three hearings were held on the proposed cancellation of Mills' employment contract. The third of these hearings was held on January 18, 2003. On January 23, 2003, Dr. Shiver informed Mills of the Board's ultimate decision to terminate her. Mills appealed to the Alabama State Tenure Commission. The Alabama State Tenure Commission affirmed the Board's decision. Mills was terminated.

Mills suffers from a litany of ailments. She suffers from

osteoarthritis for which she receives continual treatment and anti-inflammatory medication. Mills says that the illness makes her "very stiff" and swollen, and is "very painful." She has some trouble "walking and carry heavy loads" as well as sitting up straight. Her osteoarthritis also makes "waking up in the morning" difficult. She received a handicapped parking sticker to help her park closer to the building. Mills, also, suffers from asthma which forces her to carry an inhaler. Mills also has a digestive condition which causes her to have sudden diarrhea on occasion. Along the same lines, Mills has a spastic colon.  Mills was also diagnosed with stomach ulcers. The ulcers cause stomach cramps, as well as a burning sensation. Mills also occasionally suffers from migraine headaches for which she must take medication.

Mills' husband, William Joe Mills ("Mr. Mills") suffered from chronic obstructive pulmonary disease, emphysema and congestive heart failure. By 2000, Mr. Mills physical condition was very poor. He has trouble breathing and nearly continual pneumonia. Walking a very short distance was difficult for Mr. Mills. In fact, he spent 90-95% of his day in the bed. By the fall of 2002, Mr. Mills' condition had deteriorated further. Oxygen tanks were "a way of life" and, according to Mills, constant monitoring was necessary. In January 2003, Mr. Mills injured himself while handling a handgun. The gun discharged accidentally and he was shot just above his kneecap. Mr. Mills underwent surgery at UAB for his wound.

Within a day of that surgery, the Board ordered a hearing on Mills' termination. The Board refused to reschedule the hearing.

Jimmy Holifield ("Holifield") is an African-American P.E. teacher and coach at West End High School. Holifield, like Mills, often signed in late according to the faculty sign-in sheets used at West End. Holifield was tardy approximately thirty-three times during the 2001-2002 school year. Most of those tardies were in the second semester. Holifield was also absent eight times in the second semester of that year. Holifield was, according to Principal Morrow, called upon to perform off-campus school duties, unlike Mills.  Holifield was usually less than twenty minutes late, whereas many of Mills' tardies were in excess of one hour. Holifield was not disciplined for his tardies, and Principal Morrow never proposed his termination to the Board.

## **Analysis**

The Board of Education requests summary judgment on each of the claims brought by Mills.[5]

**I. Disability Claims (ADA and Alabama State law)**

The Board asks for summary judgment of both of Mills' claims

---

[5] The Board seeks summary judgment of all the claims against it on the basis of Eleventh Amendment immunity. The Board claims that it is an arm or alter ego of the state and is therefore entitled to the sovereign immunity provided by the Eleventh Amendment. *Board of the Trustees of the Univ. of Ala. v. Garrett*, 531 U.S. 356 (2001). Unfortunately, despite the many pages spent by defendant discussing the nature of local boards of education, local Alabama boards of education are not entitled to Eleventh Amendment immunity as they are not the arms of the state or fairly characterized as the state's alter ego. *Stewart v. Baldwin County Board of Education*, 908 F.2d 1499, 1511 (11th Cir. 1990). Thus, Eleventh Amendment sovereign immunity is not available to the Birmingham Board of Education.

7

of disability discrimination. In her complaint, Mills alleges violations of both the ADA and Alabama Code § 21-7-8 (1975). The court will address the ADA claim first.

To establish a *prima facie* case of discrimination under the ADA, Mills must show that she (1) had, or was perceived to have, a "disability;" (2) was a "qualified" under the statute, with or without a reasonable accommodation; and (3) was discriminated against because of her disability. *See, e.g.*, *Carruthers v. BSA Advertising, Inc.*, 357 F.3d 1213, 1215 (11th Cir. 2004). The Board contests all three elements of the *prima facie* case. Mills may show discrimination using the familiar *McDonnell-Douglas* burden-shifting regime. However, she must first establish a *prima facie* case. *Raytheon Corp. V. Hernandez* 540 U.S. 44 (2003).

A "disability" under the ADA is defined as "a physical or mental impairment that substantially limits one or more of the major life activities of such individual." *Carruthers*, 357 F.3d at 1215 *quoting* 42 U.S.C. §12102(2). The plaintiff can also meet the statutory definition of "disabled" if he/she can establish a record of such an impairment, or show that she was regarded as having a "disability" as defined above. Mills argues that she is "substantially limited in a major life activity," or at least was regarded as such by the Board.

"Major life activities" are those are of "central importance to daily life." Mills describes a number of activities in which she

was limited. For instance, Mills claims to have trouble sitting for long periods of time, as well as, "waking up in the morning" because of her osteoarthritis.[6] Further, she claims to have some trouble "walking" and "carrying heavy loads." None of the activities mentioned by Mills represent a "major life activity," with the exception of "walking."[7]

Even assuming that she was disabled[8], Mills cannot prove that she was a "qualified individual" under the ADA. Mills has not shown that she is qualified. Under the ADA, a plaintiff has the burden to show that she could perform the essential functions of the job with, or without, a reasonable accommodation. Because Mills was habitually tardy or absent she was patently unqualified without an accommodation, reasonable or unreasonable. "Technical skills and

---

[6] Without going into detail, Mills states in a conclusory manner that her other ailments (besides osteoarthritis) cause her to be limited in the major life activities listed in 45 C.F.R. § 84.3(j)(2)(ii). Mills must do more than conclude in her brief that these ailments cause her to be limited in these life activities. Actual evidence of this is necessary, not just the assertion of counsel that the ailments "also limit" her in major life activities on occasion. Therefore, the court concludes that Mills has not presented evidence that these ailments rise to the level of "disability" under the ADA.

[7] It seems to the court that there must be some nexus between the alleged disability (and its attendant limited major life activity) and the accommodations necessary for the employee to perform his or her job. Here, the only claimed major life activity which was limited was "walking." However, Mills claims the accommodations she needs is one that allows her to arrive at work later in the morning. The relation between the disability and the accommodation here is unclear. Because it is unnecessary to the disposition of this claim the court does not belabor the point, and in fact, there may be some connection between the accommodation and the disability in this case.

[8] There is a good argument to be made that even if Mills is not disabled in the statutory sense, he can make out a "regarded as" disabled claim due to the knowledge and behavior of both the Board itself in response to her original lawsuit, and Morrow's response to her "request" for reasonable accommodations.

experience are not the only essential requirements of a job." *Williams v. Motorola, Inc.*, 303 F.3d 1284 (11th Cir. 2002)(quoting *Weigert v. Georgetown Univ.*, 120 F.Supp. 2d 1, 14 (D.D.C. 2000)). An employee who is not capable of regular, predictable, attendance at work, or of working regular hours is not a qualified employee under the ADA. *See, e.g.*, *Earl v. Mervyn's, Inc.*, 207 F.3d 1361, 1365-67 (11th Cir. 2000); *Jackson v. Veteran's Administration,* 22 F.3d 277, 283 (11th Cir. 1994)(finding similarly in a Rehabilitation Act case). Here, Mills' absences and tardies were not merely unpredictable, as they were in the *Jackson* case*,* but excessive and nearly constant. *Cf. Jackson*, 22 F.3d at 282(contrasting the factual circumstances of its case, the court noted that while unpredictable absence and tardiness do not make the plaintiff *per se* unqualified, it is likely that excessive absence and tardiness do make the plaintiff unqualified as a matter of law).

Regular attendance and punctuality are essential functions of the job of a teacher. When a teacher is late or absent a substitute teacher must be found. The work of a teacher cannot merely be done after hours, or off site. Much of the work requires face to face interaction with, and regular supervision of, children. Because the tasks are of a kind which must be done at a certain time and at a certain location, regular and timely attendance at work are essential functions of the job of a teacher. *Earl*, 207 F.3d at 1366 (quoting *Jackson,* 22 F.3d at 279); *Florida Power & Light Co.*, 205

F.3d 1301 (11th Cir. 2000)(finding that mandatory overtime was an essential function of the job of a "Connect and Disconnect" employee). Mills has unquestionably failed to perform these essential functions of her job, and is therefore unqualified unless she is granted an accommodation, reasonable or unreasonable.

In response to the assertion that she was unqualified, Mills claims she requested an accommodation from Morrow when she began work at West End. Mills says that she asked for, and briefly received, an accommodation which allowed her to arrive at work after 8:15 a.m.. The accommodation was that she was given a planning period the first period of the day, and Morrow said she did not have to arrive until the first period in which she had students, which was later than the 8:15 measure which was used to tabulate her tardies. For summary judgment purposes the court assumes that such an accommodation was briefly granted, and was reasonable. The problem, from Mills point of view, is that this accommodation only solves one of the major issues which resulted in her termination. Regardless of whether the school accommodated Mills' tardiness, she was still absent regularly. Mills was absent 78 times during the 2001-2 school year. Not only were Mills' absences unpredictable, they were constant. No accommodation has been advanced by Mills which could make her "qualified" without being physically present at school. There was no reasonable accommodation available which could cure Mills' problem with

11

excessive absence, and no possible or hypothetical accommodation has even been suggested by Mills. Because no satisfactory accommodation for her excessive absence has been suggested, and because physical presence at work is an essential function of the job of a teacher, Mills was unqualified for her job, with or without any suggested accommodation. Therefore, Mills has failed to establish her *prima facie* case of discrimination under the ADA. Judgment as a matter of law is appropriate on Mills' ADA claim.

Summary judgment of Mills' claim under the Alabama Disability statute is, likewise, appropriate. Alabama Code § 21-7-8 (1975) provides:

> It is the policy of this state that the blind, the visually handicapped and otherwise physically disabled shall be employed in the state service, the service of political subdivisions of the state, in the public schools and in all other employment supported in whole or in part by public funds on the same terms and conditions as the able-bodied, unless it is shown that the particular disability prevents the performance of the work involved.

Despite its appearance as a mere policy statement, other courts have ruled that this statute provides a private cause of action against a state entity. *Etheridge v. State of Alabama*, 847 F.Supp. 903, 908 (M.D. Ala. 1993). Little is known about what such a claim might entail in the way of *prima facie* elements. However, it is clear that the disabled person must be able to show that her disability does not prevent "the performance of the work involved." For the reasons stated previously in this court's discussion of

Mills' lack of qualification, summary judgment is appropriate under the Alabama statute because physical presence at work on a regular basis is part of the "work involved" in being a public school teacher.

**II. Family Medical Leave Act**

The Board makes two arguments against Mills' claim that it violated the FMLA by denying her leave and by terminating her with retaliatory intent. First, the Board claims that Mills has produced no evidence that she was a "qualifying" individual under the FMLA. Mills has produced evidence that she qualified for coverage under the FMLA because she was employed by the Board for at least twelve months. 29 U.S.C. § 2611(2)(A). The Board provides no further, or more specific challenge to Mills' eligibility. Therefore, the court finds that for purposes of summary judgment Mills has established that she was a qualified employee during the 2001-2002 school year.

Second, the Board argues that it could not have violated the FMLA because Mills made no request for leave under the Act. To state a claim for retaliation under the act, it is obvious that the defendant must have notice that the employee needed or sought leave under the FMLA before its adverse employment action. The Board claims that there is no evidence establishing that Mills availed herself of any rights under the FMLA. The Board further notes that it has a Sick Leave and Personal Leave Policy that Mills could have

utilized.[9] The Board notes that at her deposition Mills admitted that she could not produce any written notice asking for leave to care for her husband, nor could she remember writing any such note. However, Mills has presented evidence that she told Morrow, the principal at West End, of her husband's illness. The Board's sick leave policy names the principal of an employee's school as a proper person to notify in the event FMLA leave is necessary. That Mills did not put a request in writing, or specifically mention the FMLA, is not the critical issue. It is doubtful that failure to memorialize a request for leave in writing, taken alone, is grounds for denial of a request for leave, and ultimately, termination in retaliation for her request, or for taking the leave she asked for but was apparently denied. The critical issue is whether the Board had notice sufficient for it to determine that Mills was entitled to leave under the FMLA. There is a question of fact as to that issue based on her conversations with, *inter alia*, Morrow. Mills has produced evidence countering the specific failures that the Board noted in her *prima facie* case.  Because the Board has provided the court with no other standard, basis or evidence upon judgment as a matter of law would be appropriate, the court leaves further consideration of the requirements of the FMLA until trial.

---

[9]The issue of what procedural hurdles an employer may require of an employee before approving medical leave, above and beyond the requirements of the FMLA, is currently unsettled in the Eleventh Circuit, and the court specifically avoids that question here.

**III. Title VII/1981**[10]

The Board argues that it is entitled to summary judgment of Mills' claims under Title VII and § 1981 because she cannot make out a *prima facie* case of racial discrimination under the statute. To establish a *prima facie* case of racial discrimination under either Title VII or § 1981, Mills must show (1) she was a member of a protected class; (2) an adverse employment was taken against her; (3) another similarly situated employee outside of the protected class received differing treatment from her. *See, e.g.*, *Texas Dept. of Community Affairs v. Burdine*, 450 U.S. 248, 252-23 (1981).[11] The Board does not dispute that Mills is a member of a protected class nor does it dispute that its termination of her was an adverse employment action.

Mills lists Holifield as a similarly situated employee who received more favorable treatment than she did. Holifield is an

---

[10] The Board argues that summary judgment of Mills' claim under § 1981 is appropriate because such a claim against a state actor must be brought pursuant to § 1983. *See Jett v. Dallas Independent School Dist.*, 491, U.S. 701, 735 (1989). While there has been some debate over the continuing vitality of *Jett*, the Eleventh Circuit has held that it remains good law even in light of the 1991 amendments to the Civil Rights Act. *See Butts v. County of Volusia,* 222 F.3d 891, 894 (11th Cir. 2000)(noting that "Congress provided no indication that it contemplated creating a cause of action against state actors outside of § 1983, no did it even mention the Supreme Court's decision in *Jett*"). This discussion is ultimately academic as the court, in doing its analysis for the Title VII claim, ultimately reaches the conclusion that summary judgment is appropriate on the merits, as well.

[11] In the Board's only attempt to state the *prima facie* case it managed only to state the *prima facie* case for a failure to promote or hire, not for the specific circumstances stated here. Therefore, its specific arguments related to that version of the *prima facie* case are largely inapposite. In light of Mills' claim it makes more sense to evaluate her performance in relation to Holifield whom she has stated is a comparable employee of a different race.

African-American coach and P.E. teacher at West End High School. Holifield was absent and tardy to school on many occasions, although, not as often as was Mills. However, the Board admits that Holifield did have a problem with tardiness, and he was reprimanded. However, despite this, it is hard to characterize Holifield conduct as fairly comparable to Mills. To prove the *prima facie* case via comparison with an African-American employee, Mills must show "that the quantity and quality of the comparator's misconduct be nearly identical." *Maniccia v. Brown*, 171 F.3d 1364, 1368 (11th Cir. 1999). Mills was apparently absent around 78 times that year. Mills was late on approximately 85 other occasions. Hardly a day went by in which Mills was not tardy, or absent altogether. Holifield, on the other hand, was absent only 8 times in the second semester, and tardy on approximately 33 other occasions during the school year. No further evidence about any further absences by Holifield is given by the plaintiff. Holifield's tardiness is beyond comparison to Mills' record of tardiness and absence. For a teacher to be late or absent on the vast majority of the days of the school year puts a dramatic burden on school which cannot compared to Holifield's conduct. The Eleventh Circuit requires that the comparators' conduct be "nearly identical" in both "quality and quantity." *Id.* While Holifield's conduct may be alike in "quality" it is impossible to say that it is comparable in "quantity." Mills was absent almost 10 times for

every time Holifield was absent, and was tardy almost 3 times for every time Holifield was tardy. Mills is not sufficiently "similarly situated" to Holifield to establish a *prima facie* case based on the comparison, and reasonable inferences thereto, alone. Summary judgment of the claims under Title VII and § 1981 is appropriate.

## IV.   Breach of Contract

Under Alabama law, to establish a *prima facie* case of breach of contract a plaintiff must prove: (1) the existence of a valid contract; (2) plaintiff's own performance under the contract; (3) the defendant's non-performance of the contract; and, (4) damages. *See, e.g.*, *Southern Medical Health Systems v. Vaughn*, 669 So.2d 8,99 (Ala. 1995). The Board does not dispute that its settlement agreement with Mills was a valid, binding contract. Mills alleges that she performed under the agreement, and the Board does not dispute that claim.

There is a genuine issue of material fact as to breach by the Board. Mills alleges that the Board violated paragraph 6 of the "Release and Settlement Agreement" between the parties. That paragraph reads:

> 6. The Superintendent agrees that all references to Mill's pending proposed termination action will be removed from her personnel file and will be placed only in her legal file.

Mills argues that the Board breached this paragraph of the

agreement when Superintendent Dr. Brown copied his letter of August 7, 2001 to, *inter alia*, her future supervisor at West End, Morrow, and to her personnel file. Because the letter appears to have been copied to her personnel file, and included reference to her proposed termination there is a question of material fact as to breach.[12]

The Board raises the Alabama Open Records Act as a defense to the breach. The court is confused by this argument. As the court reads the Act, and the Board's argument, the Act makes all Board actions a matter of public record and readily available to the public. The Board, somehow, thinks that this obviates its duty to perform under the contract. However, there is no general confidentiality agreement, and thus, the Board's legal duty to make the documents available *if requested* does not fly in the face of the agreement.[13] All the agreement requires is that all references to proposed termination be taken out of the personnel file and placed into Mills' legal file. The Open Records Act does not

---

[12]However, the contract contained no general confidentiality agreement. It is hard for the court to understand how copying the letter to Morrow, as well as to other Board administrators, violated paragraph 6 of the agreement. The Board does not challenge that Mills is unable to show evidence of damages. If sending the letter to Morrow was not a breach of the agreement (and it is not as the court reads the agreement), then any damages resulting from his receipt of the letter were not proximately caused by the breach. Regardless, no real argument regarding damages has been presented by the defendant, and the court is certain that Mills would be able to prove some, perhaps nominal, damages.

[13]Further, it is clear that where disclosure is detrimental to the best interests of the public, disclosure is not required. *See Stone v. Consolidated Publishing Co.*, 404 So. 2d 678, 681 (Ala. 1981). It seems likely that requiring the Board to violate the express terms of an agreement might be a circumstance where disclosure is detrimental to the public interest.

18

directly bear on the question of breach. It is possible that the Act would minimize or eliminate the damages Mills could claim because the documents were readily available to all the relevant actors. Regardless, as the court previously noted, the court does not see how that theory of damages is viable based on paragraph 6 of the agreement. All of that considered, judgment as a matter of law is inappropriate on Mills' contract claim because issues of material fact exist.

## **Conclusion**

The Board's motion for summary judgment will be granted in part, and denied in part, by separate order.

DONE this _27th_____ day of July, 2005.

_____
WILLIAM M. ACKER, JR.
UNITED STATES DISTRICT JUDGE